## COMMISSIONER OF INTERNAL REVENUE v. HAPPOLD.

### No. 10716.

Circuit Court of Appeals, Fifth Circuit.

March 3, 1944.

Warren F. Wattles, Sewall Key, and J. Louis Monarch, Sp. Assts. to the Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and Claude R. Marshall, Atty., Bureau of Internal Revenue, both of Washington, D. C., for petitioner.

Harry C. Weeks, of Fort Worth, Tex., for respondent.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

The petition for review is prosecuted by the Commissioner from decision of the Tax Court determining income tax liabilities of C. A. Happold for the years 1936, 1937, 1938 and 1939. These cases were consolidated and tried together.

Question: Does the evidence support the finding of the Tax Court that prior to May 18, 1939, taxpayer owned an undivided interest with Byrd-Frost Inc. in the "Gulf Block" oil and gas leases, or does the evidence require the conclusion that prior to that date taxpayer did not own an interest in the leases and was entitled only to share in the net profits derived by Byrd-Frost Inc. from such leases?

The important facts: Taxpayer is a geologist and resides in Texas. He married on March 3, 1932, and this marriage was terminated by divorce on June 16, 1937. On December 22, 1937 he married again and this marital relation has existed since that date. The question presented here relates to taxpayer's taxable income for the years 1936, 1937, 1938 and 1939. Income tax returns were filed by taxpayer and his wives on the community property basis except for the period of 1937, during which time he was single. The controversy relates to taxpayer's interest in and profits from a part of the block of oil and gas leases on certain properties in Gregg County, Texas.

In the year 1930 taxpayer entered into an agreement with two oil operators who were doing business under the firm name of Byrd & Frost, whereby taxpayer secured oil and gas leases on 3200 acres of land in Gregg County, Texas at $2.50 per acre, and the further provision that a well should be forthwith drilled on the leased land. Byrd & Frost agreed to finance the cash payments for the leases and their interest was to be 90% of the leases and taxpayer was to receive a 10% interest. The evidence is without dispute that this agreement was reached and consummated before the leases were acquired by taxpayer. Taxpayer assembled the leases and expended about $1,900 of his own money in such work. Thereupon Byrd & Frost sought out Gulf Production Company and

sold it a three-fourths interest in the leases and retained for themselves a one-fourth interest. This agreement provided that Gulf Company was to take charge of the block of leases, develop and operate them for their joint account, paying all necessary expenses and charging Byrd & Frost one-fourth of such expenses. Gulf Company was to collect for the oil and gas produced and after reimbursing itself for amounts expended, remit to Byrd & Frost one-fourth of the balance. This contract was not reduced to writing and formally executed until December 4, 1931, but its terms had been substantially agreed upon and Gulf Company had begun operations in accordance with the informal verbal understanding by the middle of 1931. When the contract was written Byrd & Frost had formed a corporation and the contract was made between Gulf Company and Byrd-Frost Inc. All of the development and operation of the property except the "obligation" well which was drilled by taxpayer, Byrd and Frost, was performed by Gulf Company under the terms of the contract. Taxpayer knew of the agreement between Byrd-Frost Inc. and the Gulf Company, but was not a formal party to the contract, and had no direct dealings with the Gulf Company, although that company was informed and knew of his interest in the contract.

From the beginning the owners and officials of Byrd-Frost Inc. recognized taxpayer as the owner of 10% of the interest in the Gulf properties which stood of record in the name of Byrd-Frost Inc., and he received payments from them for such interest from time to time, but he had no written evidence of this ownership until August 15, 1931, when he received from Byrd-Frost Inc. a letter showing his interest to be "in consideration of the services" he had heretofore rendered and further reciting, "we agree to give you one-tenth of the net profits received by us from the sale of this block, and one-tenth of all the net earnings accruing to the interest of Byrd-Frost Inc. by reason of the one-fourth working interest we still have in this block * * *."

It is further without dispute that Byrd-Frost Inc. was being sued for certain of its leases and later it had been made a party to a receivership suit brought by taxpayer's first wife, in which she claimed an interest in the properties. For this reason a contract showing taxpayer's interest was not made until this litigation terminated, the receivership suit not ending until 1939. After this suit Byrd-Frost Inc. and taxpayer executed a written contract reciting the interest of taxpayer and made effective as of May 1, 1939.

The interest of taxpayer was very profitable. From 1931 through 1939 taxpayer reported the amounts which he drew from Byrd-Frost Inc. and which were charged to his account, as a part of his income, reporting this as community income during the periods he was married. He designated these receipts as "commissions earned", "participating profit contract", "cash received on oil contract", and "profit sharing contract". From 1939 he reported 2½% of the gross oil and gas sales and took therefrom his ratable share of the expenses, together with depletion and depreciation. Taxpayer knew nothing about tax returns, and his returns for the first three years of this period were prepared by some one for him.

The evidence is in sharp conflict, and the Tax Court in its opinion finds that:

"The parties differ on what is basically a factual issue, petitioner contending that his status from the beginning was that of a joint venturer, so that he was entitled to deduct depletion upon the oil payments received and to treat the income as that of a marital community, and so that no substantial change in his rights took place in 1939, when he received and recorded the evidence of his interest. * * * It seems to us that the preponderance of the evidence indicates that petitioner was from the beginning a tenant in common in the income-producing property, and that what he received in 1939 was no more than the formal evidence of property rights obtained at the inception of the transaction. * * *."

The finding of the Tax Court that the taxpayer at all times after 1931 owned a part of the one-fourth working interest in the oil and gas in place is abundantly supported by the evidence. Such an economic interest in oil in place entitles the taxpayer to percentage depletion upon the income therefrom. Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489; Thomas v. Perkins, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324; Fleming v. Commissioner, 5 Cir., 82 F.2d 324.

The decision of the Tax Court is affirmed.